**KELLEY PLLC**
Justin T. Kelley (State Bar No. 336695)
3571 Far West Blvd. #126
Austin, TX 78731
Telephone: (713) 489-4316
Email: justin@kelley-firm.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL STROMBERG, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN & MORGAN, P.A.,<br><br>Defendant. | Case No. 2:26-cv-13194<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


NATURE OF THE ACTION ........ 1
PARTIES ........ 4
*Defendant* ........ 4
*Plaintiff* ........ 4
JURISDICTION AND VENUE ........ 5
FACTUAL ALLEGATIONS ........ 6
A. MORGAN & MORGAN ........ 6
1. Defendant's "Industry Leading" Technology Expertise ........ 8
2. Defendant's "Unparalleled" Data Privacy Expertise ........ 10
3. Tracking Technology and Pixels in Defendant's Own Words ........ 12
B. DEFENDANT'S SURVEILLANCE ECOSYSTEM ........ 14
1. The Wiretaps Fire Immediately ........ 16
2. The Wiretaps Intercept Every Method of Contact ........ 20
3. The Wiretaps Surveil Defendant's Consultations ........ 23
C. META AND THE META PIXEL ........ 26
1. The Meta Pixel Tracks User Activity ........ 28
2. The Meta Pixel Identifies Prospective Clients ........ 36
3. Defendant and Meta's Arrangement ........ 38
D. ADDITIONAL WIRETAPS ........ 40
E. THE TRACKING SCHEME IS WITHOUT CONSENT ........ 43
1. Defendant Subverts Its Own Compliance Software ........ 45
2. No Consent Before Collection ........ 46
3. Defendant Hides Its Privacy Policy ........ 49
4. Illusory Privacy Choices ........ 51
5. Collection on Minors ........ 53
TOLLING, CONCEALMENT & ESTOPPEL ........ 55
CLASS ALLEGATIONS ........ 56
CLAIMS FOR RELIEF ........ 59
COUNT I ........ 59
COUNT II ........ 66
COUNT III ........ 68
COUNT IV ........ 69
COUNT V ........ 71
PRAYER FOR RELIEF ........ 72
JURY TRIAL DEMANDED ........ 73

Plaintiff Michael Stromberg ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Morgan & Morgan, P.A. ("Morgan & Morgan" or "Defendant"). This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

**NATURE OF THE ACTION**

"*What we share privately should not be violated, but companies will take that information and monetize it. We cannot allow that to happen.*"

- John Yanchunis, Head of Morgan & Morgan's Class Action Department

1. This is a class action regarding a law firm betraying, at its peril, the confidential, sensitive, and secret information entrusted to it.

2. Defendant solicits prospective clients nationwide through a central website, forthepeople.com (the "Website"), and invites them to seek Defendant's legal advice and counsel.

3. Defendant's reach and size are unmatched; it bills itself as "America's Largest Injury Law Firm." Hundreds, if not thousands, of prospective clients, induced by Defendant's ubiquitous advertising, walk through its digital doors each day seeking its advice or services.

4. Defendant offers solutions to the specific legal questions or matters affecting these prospective clients. Defendant claims that it "fights for the people." The process, it professes, will be "easy" and "simple" — it may even change their life!

5. Above all, and as would be expected, Defendant promises to keep prospective client inquiries "confidential."

6. Yet Defendant betrays their confidences the moment they enter the Website. Defendant betrays them repeatedly and throughout their visit as they communicate with Defendant.

7. Unbeknownst to them, Defendant enables third-party social media and advertising technology companies (collectively, the "Eavesdroppers"), including Meta, TikTok, X ("Twitter"), OpenAI, Google, and Pinterest, to intercept its prospective client communications. The Eavesdroppers then send targeted ads to the prospective clients based on their Website activity.

8. To accomplish this scheme, Defendant willfully installs specialized code, known as tracking pixels (hereafter the "Wiretaps"), on the Website. The Wiretaps cause a prospective client's own browser to invisibly and contemporaneously transmit details about their Website activity to the Eavesdroppers.

9. These details include their identity, personal information, and specific legal inquiries. The legal inquiries are highly sensitive and specific, covering hundreds of topics ranging from car accidents to child sexual abuse, employment and racial discrimination, elder abuse, sexual harassment and assault, and all manner of injuries, from the common,

such as trucking accidents or slip-and-falls, to the obscure, such as a Starlink satellite falling out of orbit onto a car.

10. Defendant offers no notice of, nor seeks consent for, this interception scheme. Rather, it suppresses warnings, hides its privacy policy, and hinders the visitor's ability to opt out of tracking.

11. This was no accident. Defendant has a sophisticated in-house technology team. Defendant is *actively prosecuting the same legal claims in this same circuit*. Defendant is uniquely aware of how the technology works, uniquely aware of the law, and yet brazenly conducts its tracking scheme with staggering magnitude.

12. No reasonable person expects that, in an effort to seek counsel on a sensitive legal topic, the very act of visiting a law firm's website would result in the exposure of their legal inquiry and identity to multiple unrelated third parties. Indeed, as the head of Defendant's own award-winning privacy litigation practice—in the very announcement of its 2025 Law360 Cybersecurity & Privacy Group of the Year award—said: "What we share privately should not be violated, but companies will take that information and monetize it. We cannot allow that to happen."[1]

13. Thus, Plaintiff brings this class action lawsuit on behalf of all individuals in the United States who have accessed the Website or entered information into it, and whose

---

[1] MORGAN & MORGAN, *Morgan & Morgan Selected as a 2025 Law360 Cybersecurity & Privacy Group of the Year*, GLOBENEWSWIRE (Feb. 5, 2026), https://www.globenewswire.com/news-release/2026/02/05/3233334/20383/en/morgan-morgan-selected-as-a-2025-law360-cybersecurity-privacy-group-of-the-year.html.

privacy has therefore been violated by Defendant. Through this conduct, Defendant violated the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511, the California Invasion of Privacy Act, Cal. Penal Code §§ 631-632, the right to privacy secured by the California Constitution, and the California common law prohibitions against intrusion upon seclusion and breach of confidence.

## PARTIES

***Defendant***

14. Defendant Morgan & Morgan, P.A. is a Florida professional association with its principal place of business at 20 North Orange Ave., Suite 1600, Orlando, FL 32801. Defendant owns and operates the Website.

***Plaintiff***

15. Plaintiff Michael Stromberg is a natural person and citizen of California, residing in Altadena, California.

16. Plaintiff has maintained a Facebook account for several years. Plaintiff accesses Facebook on the same computer using the same browser he used to access the Website.

17. Plaintiff similarly maintains OpenAI, Google, and Pinterest accounts.

18. In January 2025, the Eaton Fire damaged Plaintiff's property in Altadena, California.

19. As of August 2026, Defendant maintains several pages on the Website dedicated to California wildfire victims. These include, e.g., "Fighting for California

Wildfire Victims," "California Wildfire Attorneys," and "Advocating for California Wildfire Victims."

20. In August 2026, Plaintiff accessed certain of these pages, seeking legal advice and representation for possible claims related to property damage incurred from the Eaton Fire. In accessing these pages, Plaintiff scrolled through each page and clicked various buttons. He also inputted personal information into the Website's intake Form and selected the Form's Case Dropdown. He did not ultimately submit the Form. Plaintiff expected that his legal inquiry and actions on the Website would remain confidential.

21. Certain of the Eavesdroppers, including Meta, intercepted Plaintiff's communications with the Website, including his identity and his interactions with the California wildfire pages, through the systematic processes described herein. Defendant aided and assisted these interceptions without Plaintiff's knowledge or consent.

## **JURISDICTION AND VENUE**

22. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the proposed class has more than 100 members, the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Defendant.

23. This Court has personal jurisdiction over Defendant because the Website collected and disseminated the information giving rise to this lawsuit in this District. Defendant conducts substantial business in this District and maintains offices in this

District. Defendant's Website allows California residents to use the Website in California and the conduct giving rise to this action arises out of and relates to that business.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, and Plaintiff resides in this District. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (d) because Defendant maintains an office in this District and is therefore subject to personal jurisdiction, and resides, here.

## FACTUAL ALLEGATIONS

### A. MORGAN & MORGAN

25. Morgan & Morgan brands itself as "America's Largest Injury Law Firm." Founded in 1988, it has grown into a national behemoth with over 1,000 attorneys licensed across all 50 states.

26. In 2026, Defendant ranked 21st on the Law360 400, the list of the largest U.S. law firms by headcount.

27. On the Website and in various press releases, Defendant claims to have recovered more than $30 billion for over 700,000 clients.

28. Since 2025, the firm's founder, John Morgan, has been recognized as a self-made billionaire by Forbes.

29. Mr. Morgan ranks law last among his professional identities. Asked whether he was principally a lawyer, businessman, or marketer, he answered: businessman first, marketing second, law last. As he put it, somewhat jokingly, "I play a lawyer on TV."[2]

30. Mr. Morgan considers himself, and his "Google law firm," to be a pioneer of legal advertising. Mr. Morgan credits himself as "the greatest legal marketer in the history of legal marketing," saying "There were no lawyers on billboards until me. There were no lawyers on the buses until me."[3]

31. Likewise, Defendant is one of the most aggressive marketers in the legal industry. The American Tort Reform Association reported that Defendant accounts for 8% of all U.S. legal-services advertising, spending over $218 million in 2024 alone.[4]

32. Defendant blankets nearly every advertising medium—television, radio, billboards, print, sports sponsorships (including NFL, NBA, MLB, NHL, and NCAA), podcasts, and digital search (Google Search, Meta, TikTok, Twitter, and YouTube)—in an attempt to drive prospective clients to the Website.

---

[2] John Morgan, Interview, *"He's Gonna Get Sued" — Billionaire DNC Mega Donor on Clinton, Epstein & Disney Revenge*, PBD PODCAST Ep. 697, at 1:28:20 (Dec. 9, 2025), https://www.youtube.com/watch?v=-tlvFgqsbIs&t=5300s.

[3] John Morgan, Interview, *Building the Google Law Firm & Why You Can't Teach Hungry*, THE GAME CHANGING ATTORNEY PODCAST Ep. 1, at 25:53, 26:25, 27:02 (Apr. 17, 2020), https://www.youtube.com/watch?v=eX2HmeWhH5c&t=1553s.

[4] AM. TORT REFORM ASS'N, *Legal Services Advertising in the United States, 2017–2024*, at 8 (Mar. 2025), https://www.atra.org/wp-content/uploads/2025/03/Legal-Services-Advertising-Report-%E2%80%93-2017-2024.pdf.

### 1. Defendant's "Industry Leading" Technology Expertise

33. John Morgan's "vision was to build a 'Google-style' operation with technology ultimately transforming his company from a law firm to a technology firm."[5]

34. To achieve this "Google-style" transformation, Defendant began, in 2016, building proprietary case-management software, centered around deriving "actionable data points" from internal client data.[6]

35. By Defendant's own account, its "Google-style" transformation was a resounding success: Defendant credited the software with 500% growth in the five years following its introduction.[7]

36. The firm has spent $300 million on tech and AI since 2021 and has committed up to $1 billion to AI tools.[8]

37. Defendant has a robust technology team supporting its "Google law firm,"[9] employing 65 people as early as 2021 in an "almost Silicon Valley-style setting."[10]

---

[5] Christine Schiffner, *Inside the 'Google-style' Tech Hub Driving Plaintiffs Firms' Growth*, NAT'L L.J. (Nov. 15, 2021), https://www.law.com/nationallawjournal/2021/11/15/inside-the-google-style-tech-hub-driving-plaintiffs-firms-growth/.

[6] *Id.*

[7] *Id.*

[8] Eric Killelea, *John Morgan Will Spend $1 Billion on AI, Build Tool for Sale*, BLOOMBERG LAW (Sept. 14, 2026), https://news.bloomberglaw.com/business-and-practice/john-morgan-will-spend-1-billion-on-ai-build-tool-for-sale.

[9] *Building the Google Law Firm, supra* note 3.

[10] *Inside the 'Google-style' Tech Hub, supra* note 5.

38. In 2023, Defendant hired Chaim Fried, a former Google engineer, to be its Chief Technology Officer. Shortly after his hiring, Fried announced he was given a "mandate to rethink" legal technology and would be hiring traditional technology positions, such as software engineers and user interface designers.[11]

39. In 2026, Defendant hired the former Head of Engineering at Amazon, to be its Chief Artificial Intelligence Officer. Announcing Chakraborti's hiring, Defendant described itself as "an industry leader" that has built "proprietary technology that standardizes and scales firm operations across the country."[12]

40. Defendant's technology team sits in a Brooklyn office that "run[s] like a startup" and serves as the firm's "operational backbone."[13]

41. From this office, Defendant's employees, such as software and analytics engineers, build the in-house and proprietary technology that, according to Defendant, "directly impact[s] tens of thousands of users on a daily basis."[14]

---

[11] Chaim Fried, FACEBOOK (Jan. 21, 2023), https://www.facebook.com/cefruby/posts/to-all-my-friends-at-google-and-microsoft-who-were-either-directly-impacted-by-l/10159610820053978/.

[12] MORGAN & MORGAN, *Morgan & Morgan Appoints Former Amazon Senior Tech Leader as Chief AI Officer*, FORTHEPEOPLE.COM (last visited Nov. 7, 2026), https://www.forthepeople.com/blog/morgan-morgan-appoints-former-amazon-senior-tech-leader-chief-ai-officer/.

[13] MORGAN & MORGAN, *Job Application for SEO Manager at Morgan & Morgan, P.A.*, GREENHOUSE (last visited Nov. 7, 2026), https://job-boards.greenhouse.io/morganmorganjobsapplynow/jobs/5745721004.

[14] MORGAN & MORGAN, *Front End Software Engineer*, BUILT IN (last visited Nov. 7, 2026), https://builtin.com/job/front-end-software-engineer/4436112.

42. Defendant's in-house software engineers build and maintain the Website, at Defendant's direction.[15]

### 2. Defendant's "Unparalleled" Data Privacy Expertise

43. Morgan & Morgan is no stranger to the legal issues at play in the data privacy realm. Indeed, in seeking appointment to plaintiffs' leadership in a privacy class action, Defendant represented to a California federal court that "Morgan & Morgan brings to bear unparalleled expertise litigating privacy class actions."[16]

44. Federal courts have repeatedly "appointed [Defendant] to leadership positions in most of the largest privacy class cases litigated to conclusion."[17]

45. Defendant served as co-lead counsel in *Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS (N.D. Cal. filed July 14, 2020), which asserted the same wiretap, eavesdropping, and privacy claims at issue here.

46. As of this filing, Defendant serves as counsel of record in *In re Meta Pixel Healthcare Litigation*, No. 3:22-cv-03580-WHO (N.D. Cal. filed June 17, 2022), one of the largest and most prominent tracking pixel cases in the country. That case also asserts

---

[15] Defendant's authorship and control appear throughout the Website's code—it uses internal names such as "MorganTracking" and "morganGlobal," along with dozens of settings and functions bearing Defendant's "mm" initials.

[16] Mot. to Appoint Morgan & Morgan, P.A. and Lynch Carpenter, LLP as Interim Class Counsel at 10, *In re Apple Data Privacy Litig.*, No. 5:22-cv-07069-EJD (N.D. Cal. May 18, 2023), Dkt. 87.

[17] *Id.*

the same wiretap, eavesdropping, and privacy claims at issue here, and those claims have survived Meta's motions to dismiss.

47. Defendant actively maintains a dedicated, plaintiff-side, data privacy litigation group, with a "full legal team of attorneys, data-security experts, and investigators" that "fight[s] for full accountability."[18]

48. Defendant's privacy litigation group was selected as the 2025 Cybersecurity & Privacy Group of the Year by Law360. Regarding the award, John Morgan said, "I am proud of our attorneys for leading the charge to ensure big corporations are held accountable when they treat your privacy as an afterthought."[19]

49. Defendant devotes a dedicated page of the Website to its privacy litigation group, entitled "Data Privacy and Cybersecurity." This dedicated page, like all pages of the Website, has the Wiretaps surreptitiously installed.

50. The dedicated page links to numerous subpages. Again, each of these subpages also has the Wiretaps surreptitiously installed.

51. For example, in an article entitled *Tax E-Filing Customers Had Financial Information Shared with Facebook*, Defendant warns the public that the Meta Pixel's "automatic advanced matching" feature "scans forms" for a user's contact information and transmits that data to Facebook "without the user's knowledge." Defendant concludes the

---

[18] MORGAN & MORGAN, *Data Privacy and Cybersecurity*, FORTHEPEOPLE.COM (last visited Nov. 7, 2026), https://www.forthepeople.com/practice-areas/data-privacy-attorneys/.

[19] *Cybersecurity & Privacy Group of the Year, supra* note 1.

article by informing the prospective client they may have a "legal claim" against companies that share private information with Meta.[20]

52. Left unsaid in the article is that the very same feature performs the very same scan, by the very same Wiretap, on the very same page. Indeed, by the time a prospective client reads Defendant's conclusion, Defendant has already allowed multiple third parties to extract their private information.

### 3. Tracking Technology and Pixels in Defendant's Own Words

53. Defendant itself admits that tracking technologies operate "without any visible indication to the user that a third party is involved" such that users "may not realize that external analytics companies are also receiving data in real time."[21]

54. Defendant itself admits that consumers might find tracking technologies' data collection "surprising, if not alarming" and that the collection "often goes beyond what consumers assume is being tracked."[22]

---

[20] MORGAN & MORGAN, *Tax E-Filing Customers Had Financial Information Shared with Facebook*, FORTHEPEOPLE.COM (last visited Nov. 7, 2026), https://www.forthepeople.com/blog/tax-e-filing-customers-had-financial-information-shared-facebook/.

[21] MORGAN & MORGAN, *How Amplitude Tracked DoorDash User Activity and What It Means for Your Privacy*, FORTHEPEOPLE.COM (last visited Nov. 7, 2026), https://www.forthepeople.com/blog/how-amplitude-tracked-doordash-user-activity-and-what-it-means-your-privacy/.

[22] *Id.*

55. Defendant itself admits that tracked activity "may include pages viewed…, forms visited, device identifiers, IP addresses, or other digital signals that can be used for advertising or analytics."[23]

56. Defendant itself admits that while tracking technologies may claim to be anonymized, "the reality is that behavioral data, especially when combined with identifiers, can still be linked back to individual users."[24]

57. Defendant itself admits that tracking pixels are "custom-built code" from "tech giants," like Meta and TikTok, and allow a website operator to "share information about [a visitor's] activity with the tech giants" in "real-time."[25]

58. Defendant itself admits that the Meta Pixel includes a feature, known as "automatic advanced matching," that "scans forms looking for fields containing data such as name…, phone number, or email address."[26]

---

[23] MORGAN & MORGAN, *The Rise of Cookie Banner Class Actions: What Consumers Should Know About Online Tracking and Privacy Rights*, FORTHEPEOPLE.COM (last visited Nov. 7, 2026), https://www.forthepeople.com/blog/rise-cookie-banner-class-actions-what-consumers-should-know-about-online-tracking-and-privacy/.

[24] *How Amplitude Tracked, supra* note 21.

[25] MORGAN & MORGAN, *Telehealth Start-up Cerebral Shares Patient Data with Social Media Giants Meta and TikTok*, FORTHEPEOPLE.COM (last visited Nov. 7, 2026), https://www.forthepeople.com/blog/telehealth-start-cerebral-shares-patient-data-social-media-giants-meta-and-tiktok/.

[26] *Tax E-Filing, supra* note 20.

59. Defendant itself admits that after scanned information is sent to Meta, the company "uses the information to link other pixel data to Facebook and Instagram profiles."[27]

60. Defendant itself admits that "personal data misuse," including "invasive tracking," has "real consequences."[28]

61. As Defendant itself admits: "Pixels, device IDs, and cross-site identifiers have turned 'marketing' into a surveillance ecosystem, and that's why litigation is accelerating."[29]

**B. DEFENDANT'S SURVEILLANCE ECOSYSTEM**

62. Defendant has created one of the largest surveillance ecosystems in the legal industry.

63. Defendant utilizes hundreds of pieces of computer code, many from third-party companies,[30] that track, record, analyze, or identify a prospective client's interactions with the Website in obsessive detail.

---

[27] *Id.*

[28] MORGAN & MORGAN, *Data Privacy Day 2026: Keeping Your Private Info Private and Big Cases to Watch*, FORTHEPEOPLE.COM (last visited Nov. 7, 2026), https://www.forthepeople.com/blog/data-privacy-day-2026-keeping-your-private-info-private-and-big-cases-watch/.

[29] *Id.*

[30] Defendant invisibly configures the Website to instruct a prospective client's browser which outside destinations it is permitted to contact. Defendant expressly authorizes more than 150 third-party destinations.

64. Defendant records nearly all actions of a prospective client including the exact movements of their mouse, information typed, pages viewed, content read, time spent on a page, buttons clicked, time spent hovering on an element, taps, swipes, scrolls, device information, operating system details, mobile battery levels, geographical locations, and other granular facets.

65. Through the Website's surveillance, Defendant has amassed one of the largest troves of behavioral data ever assembled by a law firm: the moment-by-moment conduct, behavioral traits, and characteristics of its prospective clients, mined for what Defendant calls "actionable data points."[31]

66. Defendant desires still more: it installed tracking pixels, the Wiretaps, so that the Eavesdroppers may also share in Defendant's amassed prospective client data.

67. As a prospective client interacts with the Website, the Wiretaps secretly intercept these interactions and transmit data (hereafter "Intercepted Contents") to the Eavesdroppers, including without limitation:

a. the contents of a prospective client's communications, including the nature of their legal inquiry, their intention to seek legal advice or counsel, and much of the correspondence between the prospective client and Defendant;

---

[31] *Inside the 'Google-style' Tech Hub,* supra note 5.

b. the contents of the Website's pages, including the Website's uniform resource locators (URLs), page titles, page descriptions, and other metainformation; and

c. identifying information, including third-party account identifiers, personal information, contact information, cookies, browser characteristics, and behavioral analytics.

**1. The Wiretaps Fire Immediately**

68. Defendant configured the Wiretaps to fire the moment a prospective client first interacts with the Website—a mouse movement, a scroll, a tap.

69. The *instant* this first interaction occurs, the Wiretaps transmit descriptive information about the page the prospective client is viewing.

70. The information transmitted includes, among other things, page titles, page descriptions,[32] and URLs[33] (collectively, "Descriptors"), each authored by Defendant.

71. These Defendant-authored Descriptors are highly particularized and specific. They reveal to the Eavesdroppers not only that the prospective client is on a lawyer's website, but often the precise nature of their legal inquiry or matter (each such page, a "Legal Content Page").

---

[32] Page descriptions can appear as a preview of a page in search engine results or when a page is shared, but are largely invisible to a prospective client.

[33] When a prospective client views a page of the Website, the prospective client's browser transmits to Defendant's servers a request that names, by URL, the specific page the prospective client wishes to read. A prospective client cannot view any page of the Website without this exchange.

72. The following examples illustrate the Website's page titles:

| |
|---|
| Can I Sue Edison for Wildfire Damage? |
| Will Joining a Wildfire Lawsuit Hurt My Insurance Claim? |
| What Do I Do After Being Abused by a Clergy Member? |
| What Should I Do if I Get Into a Fight at Work? \| Morgan & Morgan |
| Los Angeles Sexual Assault Lawyer \| Morgan & Morgan Law Firm |
| Vaginal Mesh Complications: Legal Options for Patients |

73. The following examples illustrate the Website's page URLs:[34]

| |
|---|
| office-locations/california/wildfire-lawyers |
| blog/what-do-if-your-wildfire-insurance-claim-denied |
| office-locations/california/child-sexual-abuse |
| faq/wrongful-death-lawyers/what-should-i-do-if-my-family-members-death-was-wrongful |
| practice-areas/trucking-accident-attorneys |

[34] Defendant's URLs all begin with the Website's domain, https://forthepeople.com/. For brevity, this is omitted in example URLs.

| |
|---|
| contact-us/ca-me/sexual-abuse-hospitals-healthcare-facilities |
| practice-areas/brain-injury-attorneys |
| blog/injured-fallen-starlink-satellite-our-cosmic-debris-injury-lawyers-are-here-help |

74. The following examples illustrate the Website's page descriptions:

| |
|---|
| If you're recovering from a California wildfire or other disaster, our law firm's wildfire attorneys are here to help you fight for the compensation you deserve. |
| Our whistleblower attorneys fight for the rights of those who speak out. Contact us for a free and confidential case evaluation to learn more about your options. |
| If you or your loved one is a survivor of child sexual abuse, our child sexual abuse lawyers are here for you with a confidential, free case evaluation. |
| Race discrimination in the workplace is a serious issue that continues to affect employees across various industries. Despite legal protections, many individuals still experience unequal treatment based on race, color, or ethnicity. Race discrimination at work can take many forms, from overt racial slurs to more subtle actions like unequal pay or promotions. Regardless of its severity, it is illegal in the workplace. |

| |
|---|
| AI chatbots are often marketed as helpful tools for conversation, companionship, and advice. If your child suffered suicide, attempted suicide, or self-harm after harmful chatbot interactions, Morgan & Morgan is reviewing claims nationwide and may be able to help. |

75. A single Descriptor, alone, reveals significant details to the Eavesdroppers.

76. For example, through Defendant's URLs, and URLs alone, an Eavesdropper is able to reasonably surmise not only that a prospective client may be interested in the services of a law firm, but also the precise details of their injury, including the type of injury along with the state, city, and even venue (e.g., an airport) in which it occurred, as the following table illustrates (emphasis added):

| |
|---|
| office-locations/**california**/**los-angeles**/**car-accident**-lawyer |
| office-locations/**california**/**labor-and-employment**-lawyers/**wrongful-termination** |
| office-locations/**florida**/**daytona-beach**/**slip-and-fall**-attorneys/where-can-i-find-the-best-**airport-accident**-lawyers |

77. The Wiretaps include one or more Descriptors in all transmissions.

78. When combined with the additional data transmitted by the Wiretaps, the Descriptors become even more revealing.

79. For example, an Eavesdropper receiving the Defendant-authored title "What Should I Do If My Child Was Abused by a Priest" would be able to narrow the potential claim to a specific city by combining it with the visitor's geolocated IP address.

80. The Wiretaps transmit not only upon the prospective client's first interaction with a Website page, but also throughout their time on the Website, with each transmission carrying one or more Defendant-authored Descriptors.

**2. The Wiretaps Intercept Every Method of Contact**

81. The Website is designed to convert prospective clients into clients by offering several different channels for prospective clients to communicate with Defendant about their potential claims or to obtain legal help (each, a "Contact Method").

82. Defendant allows the Eavesdroppers to intercept each and every one of these Contact Methods.

83. Over 10,000 pages of the Website contain a client intake form (the "Form") that encourages prospective clients to submit details about their legal inquiry.







84. The Form is usually displayed prominently. If a prospective client scrolls away from the Form, multiple links are presented throughout a page's content to invite them back to it. The Form will usually appear multiple times on the same page.

85. The Form has a button labeled "- Case Type -" (the "Case Dropdown") that allows a prospective client to categorize the nature of their legal matter.

86. The Wiretaps fire when a prospective client uses the Form. Specifically, they will be intercepted at least four times:

a. Once when they press the Case Dropdown button.

b. Again, when they press the submit button, *before* the Form has actually been submitted to and received by Defendant.

c. Again, when the Form is actually received by Defendant.

d. Again, when their browser is automatically redirected to Defendant's post-submission confirmation page.

87. The Website also prominently features a link that facilitates a call to Defendant from the prospective client's device (the "Call Now Button").




88. The Call Now Button is unavoidable. As a prospective client scrolls down, the Call Now Button remains affixed to the top of the page.

89. The Wiretaps fire when a prospective client presses the Call Now Button.[35] Through it, the Eavesdroppers will know the prospective client's particular legal inquiry and that they are calling Morgan & Morgan about it, before the phone touches their ear.

90. The Website also prominently features links that initiate live chats (the "Message Us Buttons") between Defendant and a prospective client.[36]

---

[35] If a prospective client clicks the Call Now Button from their mobile device, the Website will open their mobile device's phone application with Defendant's number auto-filled. However, the Call Now Button appears and triggers the Wiretaps regardless of the type of device that is being used to access the Website.

[36] Clicking the Message Us Buttons will cause a chat window to appear where the prospective client is invited to engage in a "secure and confidential" conversation with Defendant.




91. The Message Us Buttons appear in several ways, including via pop-ups (as shown above) and via "Text Us" buttons which are permanently affixed to the side of a page.

92. The Wiretaps fire the *instant* a prospective client clicks or taps a Message Us Button. In TikTok's case, Defendant allows TikTok to record each time the prospective client sends a message.

93. The Form, the Call Now Button, and the Message Us Buttons appear on over 10,000 pages of the Website.

**3. The Wiretaps Surveil Defendant's Consultations**

94. Defendant makes extensive use of intake quizzes (the "Quiz(zes)"), which induce prospective clients to answer a series of questions related to a particular legal claim or inquiry.







95. Throughout the Website, prospective clients are encouraged to complete the Quizzes to "start [their] claim." The majority of Defendant's Meta advertisements are also directed to one of its Quizzes.

96. The Wiretaps are highly active on Quizzes, silently surveilling prospective clients from beginning to end. The Wiretaps fire when the Quiz is first accessed, every time the prospective client presses the "Get Started" or "Continue" buttons to progress forward, and when the prospective client completes the Quiz (if they ever do).

97. Each time a prospective client presses the "Continue" button of any Quiz, the Wiretaps transmit to the Eavesdroppers the identity of the prospective client, the details of the Quiz they are undertaking, and the labels of the questions they just answered, including questions about their health conditions or the deaths of their children.

98. Notably, several Quizzes contemplate legal action *against* the Eavesdroppers themselves. Defendant not only allows the Eavesdroppers to know that a particular person

is contemplating legal action against them, but includes details about their case, *including their belief that their child has been sexually exploited or committed suicide at the hands of the Eavesdroppers*.







99. For instance, the Twitter Pixel is particularly active on Defendant's "Grok AI Lawsuit" Quiz, which contemplates legal action against Twitter's corporate owner over alleged AI-generated nude or sexualized images of children. A prospective client who completes it will have their information contemporaneously transmitted to Twitter between ten and twenty times.







100. Similarly, in Defendant's "Social Media Harm" Quiz, Meta and TikTok will know that a prospective client has answered a question listing *their platforms by name* in a Quiz that contemplates the "real-world harm their products have caused"; they will know the prospective client has answered whether their social media platforms resulted in a suicide; they will know when the prospective client has given Defendant the date of the suicide. This all occurs before the prospective client completes the Quiz, much less hires an attorney, if indeed they ever do either.

**C. META AND THE META PIXEL**

101. Consider a representative example: a prospective client who was hurt in a trucking accident views a page on the Website related to trucking accidents. He does not contact Defendant; instead he closes the Website and goes to Facebook. He will quickly, if not immediately, be greeted with Defendant's advertisement, asking if he was "HIT BY A TRUCK."




102. This example illustrates the core purpose behind Defendant’s scheme with Meta. Defendant does not pay millions to Meta so that it can show random advertisements to random people at random times; it desires Meta to show *specific* advertisements to *specific* people, as soon as possible.

103. Meta, despite amassing one of the largest troves of personal data in history, is not, in fact, all-knowing. It cannot, for instance, readily divine that a prospective client was hit by a truck, or at the very least was contemplating truck-related legal options, without Defendant’s help.

104. By its installation of the Meta Pixel, Defendant allows Meta to learn which of its users is a prospective client and what legal matter they are exploring. Defendant then pays Meta to show the same prospective client advertisements based on their specific legal matter, such as that they were hit by a truck or were harmed by toxic baby formula.

105. The Meta Pixel, which Defendant installed and configured on over 10,000 pages of the Website, is the critical nexus by which this scheme is accomplished.

106. The Meta Pixel, according to Meta, is a "small snippet of code" that "tracks…people and the types of actions they take."[37]

107. When a user takes a particular action on a website, the Meta Pixel instantly transmits data surrounding the action, along with identifiers, to Meta.

108. Meta then "attempts to match the event data it receives to users of Meta platforms, like Facebook and Instagram, so that web developers can target advertisements toward those users based on the event data." *In re Meta Pixel Tax Filing Cases,* 826 F. Supp. 3d 1217, 1227 (N.D. Cal. 2026).

109. These dual functions behind the Meta Pixel, tracking activity and assisting in the identification of individuals, are inextricably intertwined.

**1. The Meta Pixel Tracks User Activity**

110. One of the Meta Pixel's core functions is to track activity on a website. Fundamental to this function is intercepting the actions a person takes on a website, properly contextualizing them, and sending them to Meta.

111. Every Meta Pixel transmission includes, at a minimum, the following pieces of contextualizing information:

[37] META, *Retargeting: How to Advertise to Existing Customers with Ads on Facebook*, META FOR BUSINESS (last visited Nov. 7, 2026), https://www.facebook.com/business/goals/retargeting.

| Key | Explanation |
|---|---|
| Meta Pixel ID # | The unique, Meta-assigned identification number of the Meta Pixel, tied to one Meta customer.[38] |
| Event Name | The category of a particular action as defined by Meta, e.g., a page view, a button click, a form submission.[39] |
| Time | The exact time an action occurred, accurate to the millisecond. |
| URL | The Defendant-authored page URL. |
| Title | The Defendant-authored page title. |
| Description | The Defendant-authored page description. |

112. The Meta Pixel also includes additional context related to buttons, quizzes, and forms.

113. For instance, if a form is present on a website, the Meta Pixel includes, at a minimum, the fields of the form, i.e., the questions asked of a prospective client.

[38] Defendant's Meta Pixel ID # is 949599355081131.

[39] Meta has predefined these events, each naming a category of visitor conduct Meta deems commercially significant. Among them are "PageView," "SubscribedButtonClick," "Calls," and "Lead."

114. Or, for instance, when a button is clicked, the Meta Pixel will include "the labels of those buttons and any pages visited as a result of the button clicks."[40]

115. According to Meta, the Meta Pixel "will log *when* someone takes an action, also called an event, on [a] website." (emphasis added).[41] The Meta Pixel transmits simultaneously with a website visitor's actions by design.

116. Within its Meta Business Account, Defendant enabled a feature named "Automatic Events." This feature allows Meta, rather than Defendant, to define the scope of communications it will intercept—Meta takes an expansive view.

117. The moment a prospective client first interacts with any page of the Website, the Meta Pixel reports a PageView event to Meta.

118. For example, when Plaintiff first touched his mouse while on a page related to California wildfires, the Meta Pixel simultaneously transmitted a "PageView" event.

119. The following image is representative of a PageView transmission.[42]

---

[40] META, *Meta Pixel* (Nov. 15, 2023), https://developers.facebook.com/documentation/meta-pixel.

[41] META, *About Meta Pixel*, META BUSINESS HELP CENTER (last visited Nov. 7, 2026), https://www.facebook.com/business/help/742478679120153.

[42] An average Meta Pixel transmission is thousands of characters. This and all subsequent representative images of Wiretap transmissions are excerpted and reformatted for readability; the transmitted values are reproduced as sent. Every transmission includes the information alleged herein, regardless of its appearance or lack of appearance in a condensed representative image. Emphasis is added via yellow highlights.

```
"method":         "GET",
"url":            "https://www.facebook.com/tr/?id=949599355081131&ev=PageView[...]",
"queryString": {
        "ev":                      "PageView",
        "dl":                      "https://www.forthepeople.com/practice-areas/california-wildfires/",
        "pmd[title]":              "California Wildfire Attorneys | Morgan & Morgan",
        "pmd[description]":        "If you're recovering from a California wildfire or other disaster,
        our law firm's wildfire attorneys are here to help you fight for the compensation you deserve.",
}
```


120. The Meta Pixel dutifully reports to Meta any time *any* button is clicked, the *instant* a prospective client's finger lifts from their mouse.

121. If a prospective client clicks a button to navigate to a new page, the Meta Pixel reports the page they are on and the page they are going to, *before* the new page loads. Then, once the prospective client arrives on the new page, the Meta Pixel reports another PageView event, beginning the interception process anew.

122. The following images illustrate such transmissions.


```
"method":         "GET",
"url":            "https://www.facebook.com/tr/?id=949599355081131&ev=SubscribedButtonClick[...]",
"queryString": {
      "ev":                      "SubscribedButtonClick",
      "dl":                      "https://www.forthepeople.com/practice-areas/california-wildfires/",
      "cd[pageFeatures]":        {"title":"California Wildfire Attorneys | Morgan & Morgan"},
      "pmd[description]":        "If you're recovering from a California wildfire or other disaster, our law
firm's wildfire attorneys are here to help you fight for the compensation you deserve.",

      "cd[buttonFeatures]":   {
            "destination":       "https://www.forthepeople.com/blog/can-i-sue-edison-wildfire-damage/",
            "innerText":         "Can I Sue Edison for Wildfire Damage?"
      }
}
```

```
"method":        "GET",
"url":           "https://www.facebook.com/tr/?id=949599355081131&ev=PageView[...]",
"queryString": {
        "ev":                   "PageView",
        "dl":                   "https://www.forthepeople.com/blog/can-i-sue-edison-wildfire-damage/",
        "pmd[title]":           "Can I Sue Edison for Wildfire Damage? | 5/6/2025",
        "pmd[description]":     "Learn your legal options after the California wildfires.If you or your
family were impacted by the Eaton wildfire, you may be able to file a legal claim against the utility
company. Downed power lines or faulty equipment owned by the utility company Southern California
Edison have been linked to the cause of these fires.",
}
```


123. If a prospective client clicks a Message Us Button to send Defendant a message or the Call Now Button to call Defendant, the Meta Pixel reports.

124. When a prospective client takes an intake Quiz, the Meta Pixel will report their progress each time the "Continue" button is clicked.

125. For instance, when a prospective client enters the name of their child in Defendant's "Toxic Baby Formula" Quiz and clicks the Continue button, the Meta Pixel silently transmits the name[43] they entered, as the following representative images illustrate.




[43] The Meta Pixel's handling of names will be discussed *infra*. In short, it transmits a unique, deterministic hash that Meta matches against its own records. In representative images, the hashed value is shown as transmitted; for the reader's convenience, the corresponding plain-text value is annotated after it in bold red text following an equal sign. The annotation is not part of the transmission.

```
"method":          "POST",
"url":             "https://www.facebook.com/tr/?id=949599355081131&ev=SubscribedButtonClick[...]",
"postData": {
    "ev":                    "SubscribedButtonClick",
    "dl":                    "https://www.forthepeople.com/contact-us/quiz/toxic-baby-formula/"
    "cd[pageFeatures]": {
            "title":         "Contact Us | Quiz | Toxic Baby Formula | Morgan & Morgan"
    },
    "cd[buttonFeatures]": {
        "destination":       "https://www.forthepeople.com/contact-us/quiz/toxic-baby-formula",
        "innerText":         "Continue"
    },
    "cd[formFeatures]":      {
        "id":                "baby_formula_child_name",
        "name":              "baby_formula_child_name"
    }
    "udff[fn]":      "96d9632f363564cc3032521409cf22a852f2032eec099ed5967c0d000cec607a",  = john
    "udff[ln]":      "799ef92a11af918e3fb741df42934f3b568ed2d93ac1df74f1b8d41a27932a6f",  = doe
}
```


126. If the prospective client indicates that their child has died, Defendant asks when the death occurred. Once the prospective client enters the child's death date and clicks "Continue," the Meta Pixel reports this to Meta, while still including the name of the child previously inputted, as the following representative image shows.


```
"method":          "POST",
"url":             "https://www.facebook.com/tr/?id=949599355081131&ev=SubscribedButtonClick[...]",
"postData": {
    "ev":                    "SubscribedButtonClick",
    "dl":                    "https://www.forthepeople.com/contact-us/quiz/toxic-baby-formula/"
    "cd[pageFeatures]": {
            "title":         "Contact Us | Quiz | Toxic Baby Formula | Morgan & Morgan"
    },
    "cd[buttonFeatures]": {
        "destination":       "https://www.forthepeople.com/contact-us/quiz/toxic-baby-formula",
        "innerText":         "Continue"
    },
    "cd[formFeatures]":      {
        "id":                "baby_formula_death_date",
        "name":              "baby_formula_death_date"
    }
    "udff[fn]":      "96d9632f363564cc3032521409cf22a852f2032eec099ed5967c0d000cec607a",  = john
    "udff[ln]":      "799ef92a11af918e3fb741df42934f3b568ed2d93ac1df74f1b8d41a27932a6f",  = doe
}
```

127. The Meta Pixel also takes particular interest in the Form. When a prospective client submits the Form, at least four Meta Pixel transmissions will be sent.

128. When a prospective client clicks the Case Dropdown button, the Meta Pixel reports this click, along with any information the prospective client has already entered into the Form, including their contact information, as the following representative images illustrate.



```
"method":        "POST",
"url":           "https://www.facebook.com/tr/",
"postData": {
    "id":                  "949599355081131",
    "ev":                  "SubscribedButtonClick",
    "cd[buttonText]":      "- Case Type -",
    "dl":                  "https://www.forthepeople.com/office-locations/california/los-angeles/sexual-assault-lawyers/",
    "cd[pageFeatures]":{
        "title":           "Los Angeles Sexual Assault Attorneys | Morgan & Morgan Law Firm"
    },
    "pmd[description]":    "Sexual assault can have devastating physical, emotional, and financial effects. Survivors in Los Angeles often face medical treatment, therapy, lost wages, and the long-term trauma of such a violent experience. No one should endure this alone or without justice.",

    "udff[fn]":      "81f8f6dde88365f3928796ec7aa53f72820b06db8664f5fe76a7eb13e24546a2",   = jane
    "udff[ln]":      "799ef92a11af918e3fb741df42934f3b568ed2d93ac1df74f1b8d41a27932a6f",   = doe
    "udff[ph]":      "0b04636ffb0a53f3deab81b5128eb8310e5db08f927731ad79a62811635f79d6",   = 2130000000
    "audff[zp]...":  "ac911e4a8f2b48c071ce0fbb434c039c48e60e8d96dff768f69daa740af0c3bb",   = 90000
    "udff[em]":      "86e0b9e56c17cc4d12387e1949b85053fbe73bc3ce5a1188713a9d300cc6133d",   = jane.doe@example.com
}
```


129. Many of the Eavesdroppers' respective Wiretaps scrape the Form for a prospective client's contact information when the Case Dropdown button is clicked. The Form cannot be submitted without selecting a category from the Case Dropdown.

130. When a prospective client clicks the "submit" button on the Form, the Meta Pixel transmits the event to Meta at the exact moment the button is clicked, *before* the Form is even submitted to Defendant. The Meta Pixel then transmits an *additional* event once the Form has been submitted to Defendant. It then transmits again once the Form confirmation page loads, beginning the interception process anew.

131. The summation of Meta Pixel transmissions amounts to a near-live feed of a prospective client's activity on the Website. Meta knows that a prospective client is communicating with a law firm, and when. Meta knows the nature of their legal inquiry. Meta knows each page they access, before the page loads. Meta knows the prospective client is calling the firm, before the phone is to their ear. Meta knows they are filling out

the Form, before Defendant knows. *Meta knows the prospective client is interested in suing Meta, before a lawyer is ever retained*.

**2. The Meta Pixel Identifies Prospective Clients**

132. The Meta Pixel's other core function is to match the website activity of an otherwise anonymous visitor to a real person, or as close as possible.

133. To Meta, the most coveted association it can make between identity and activity is matching an otherwise anonymous visitor with a Meta account, like a Facebook profile.[44]

134. The Meta Pixel was designed to be inescapable. A prospective client with a Facebook account can first close or log out of Facebook before visiting the Website, and yet the Meta Pixel can identify them. They can block third-party cookies, and yet the Meta Pixel can identify them. They may never have created a Meta account, and yet the Meta Pixel can still ensure they receive targeted ads.

135. Each Meta Pixel transmission carries metadata[45] ("Technical Data") about the transmission.

136. The sum of a user's Technical Data is used to create a unique, or near-unique, fingerprint. Meta uses Technical Data fingerprints to identify users by comparing the fingerprint against its vast trove of existing fingerprints.

---

[44] Facebook requires profiles to be under the real name of a person. It sometimes requires them to prove identity by uploading official identification.

[45] This includes the Website URL, referring URL, HTTP header information, browser and operating-system details, screen dimensions, and other technical characteristics.

137. Each Meta Pixel transmission also carries multiple cookies that contain unique identifiers associated with the prospective client's Meta accounts and web browser.

138. These cookies include, among others, the c_user, datr, fr, and _fbp cookies. Although they each work through slightly different mechanisms, the Meta Pixel's cookies allow Meta to match an otherwise anonymous visitor with the prospective client's Facebook profile. Meta likely identified Plaintiff using the c_user cookie.

139. The Meta Pixel also carries any contact information the prospective client has inputted into any form, via the Meta Pixel's "Automatic Advanced Matching" feature, which Defendant enabled.

140. Before transmitting, the Meta Pixel scans any contact information the prospective client has inputted into the Website, including their first name, last name, phone number, zip code, and email address. The Meta Pixel then "hashes" the information, via the SHA-256 mathematical algorithm, before transmitting it.[46]

141. Meta then uses the information to "more accurately determine which people"[47] took an action on the Website by comparing the transmitted information against its vast trove of existing contact information.

---

[46] The SHA-256 algorithm is deterministic; a value only has, and will only ever have, exactly one corresponding SHA-256 hash.

[47] META, *About Advanced Matching for Web*, META BUSINESS HELP CENTER (last visited Nov. 7, 2026), https://www.facebook.com/business/help/611774685654668.

142. For instance, if a prospective client inputs an email address into the Form that is, or ever was, associated with a Meta account, Meta matches the "hashed" email against its own records and effectuates the identity match.

143. The Federal Trade Commission has long taken a dim view of hashing as a privacy mechanism: "Hashes aren't anonymous and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized." (quotation marks omitted).[48]

### 3. Defendant and Meta's Arrangement

144. Defendant has no need for the Meta Pixel's nominal ability to "track website activity"; Defendant already pays for and implements several third-party software suites that allow for far more advanced activity tracking, including Mouseflow, AB Tasty, and Segment.

145. Meta's value to Defendant is its ability to immediately de-anonymize a prospective client the moment they access the Website. Defendant's business model needs the *specific* prospective client de-anonymized and inserted into its marketing funnel immediately, so that they can be aggressively advertised to across the internet. This form of invasive tracking is one of the "Google-style" implementations that has fueled Defendant's singular growth.

---

[48] FED. TRADE COMM'N, *No, Hashing Still Doesn't Make Your Data Anonymous* (July 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

146. Defendant cannot claim to be ignorant of the risks associated with this approach. It employs sophisticated technology teams and data privacy specialists. It knew, or should have known, the full capabilities and implications of using the Meta Pixel without guardrails.

147. The Meta Business Tools Terms[49] warn Defendant about the risks associated with using the Meta Pixel, and how to properly restrict its functionality.[50] Defendant chose to ignore these guidelines.

148. Meta, for its part, willfully acquiesces to Defendant's unbridled use of the Meta Pixel. Indeed, Meta is well incentivized to overlook Defendant's abuses.

149. Defendant is one of Meta's largest legal advertisers, if not the largest, and pays Meta millions in advertising fees per year. But perhaps even more valuable is Defendant's steady stream of data; Defendant allows Meta to tap hundreds of thousands, if not millions, of communications with Defendant. Meta feeds each of these intercepted communications into the dossier it already keeps on that prospective client and exploits

---

[49] META, *Meta Business Tools Terms* (Nov. 3, 2025), https://www.facebook.com/legal/technology_terms.

[50] For example, the Meta Business Tools Terms require operators not to transmit sensitive information and to place a "clear and prominent notice on each web page where [Meta's] pixels are used."

that dossier however it sees fit—to target advertising, to decide what the prospective client sees on Facebook or Instagram feeds, and even, as Meta indicates,[51] to train its AI models.

150. Meta is certainly able to apply restrictions to Defendant's use of Meta's products and services based on the category of data being transmitted.

151. Indeed, it has done so in the past when its own interests were at stake. On April 9, 2026, two weeks after Meta was found negligent in a California case alleging harm from social media addiction, it began removing Defendant's advertisements that were "seeking clients that claim to have been harmed by social media while under the age of 18." A Meta spokesperson explained: "We will not allow trial lawyers to profit from our platforms while simultaneously claiming they are harmful."[52]

152. Yet, where Meta and Defendant both profit, no such restrictions are to be found. Meta allows Defendant to facilitate the tracking scheme unabated.

**D. ADDITIONAL WIRETAPS**

153. Defendant also installed the Wiretaps of TikTok, Twitter, OpenAI, Google, and Pinterest on over 10,000 pages of the Website.

---

[51] META, *Better Personalization and Changes to Controls for Your Activity From Other Businesses* (June 9, 2026), https://about.fb.com/news/2026/06/better-personalization-and-changes-to-controls-for-your-activity-from-other-businesses/.

[52] Dan Primack, *Scoop: Meta Removes Ads for Social Media Addiction Litigation*, AXIOS (Apr. 9, 2026), https://www.axios.com/2026/04/09/meta-social-media-addiction-ads.

154. The additional Eavesdroppers and their respective Wiretaps largely share similar, if not the same, features, motivations, and facts alleged against Meta and its Meta Pixel.

155. Each Wiretap's core purpose is to track activity on a website and assist the Eavesdroppers in associating that activity with a discrete individual. The Eavesdroppers use these associations to target advertising to these individuals based on their Website activity. In many cases, they also use Intercepted Contents to train certain AI products, such as the Twitter-affiliated product Grok.

156. Each of the Wiretaps transmits one or more Defendant-authored Descriptors, allowing the Eavesdroppers to learn of a prospective client's confidential legal inquiry. The Wiretaps of TikTok, Twitter, and Google transmit all three Descriptors.

157. The TikTok Pixel goes one step further, also including substantial portions of a page's content. For instance, if a prospective client is viewing one of Defendant's practice areas on the Website, the TikTok Pixel will transmit the full questions and answers included within the "frequently asked questions" section.

158. All of the Wiretaps transmit when a prospective client views a page or submits a Form or Quiz.

159. Many of the Wiretaps transmit upon button clicks, including the Case Dropdown button, the Call Now Button, Message Us Buttons, and Quiz buttons.

160. Using features that function similarly to Meta's "Automatic Advanced Matching," all of the Wiretaps intercept prospective clients' contact information inputted into a Form or Quiz, as detailed in the table below.

| Name | Contact Information Intercepted |
|---|---|
| TikTok Pixel | First name, last name, email address, phone number, and zip code. |
| Twitter Pixel | Email address and phone number. |
| OpenAI Pixel | First name, last name, email address, phone number, and zip code. |
| Google Tag | Email address and phone number. |
| Pinterest Pixel | Email address. |

161. The Eavesdroppers are aware that their respective Wiretaps are intercepting communications between a law firm and prospective clients. Each Eavesdropper assigned a unique identifier to Defendant that is included in all Wiretap transmissions, as shown in the table below. These unique identifiers are tied to Defendant's law practice, and its law practice alone.

| Name | Defendant's Unique, Eavesdropper-assigned Identifier |
|---|---|
| TikTok | CLTICERC77U441RFHQ60 |

| | |
|---|---|
| Twitter | nxfy9 |
| OpenAI | XZ6sdypEJ3tiXu6MfypUvd |
| Google | 528NQ197MF |
| Pinterest | 549761871184 |

162. Each of the Wiretaps transmits Technical Data and cookies that are used by the Eavesdroppers to identify the prospective client.

163. Notably, the foregoing describes only observable transmissions. Meta and other Eavesdroppers also provide server-side conversion APIs capable of transmitting additional event and identifying data directly from Defendant's servers, beyond the reach of browser-side inspection.

**E. THE TRACKING SCHEME IS WITHOUT CONSENT**

164. Defendant enables the Eavesdroppers to operate their tracking scheme without the consent of its prospective clients.

165. Defendant itself admits the importance of affirmative consent: "Consent can't be hidden in fine print…the consent needs to be real, not buried, implied, or designed to be ignored." (quotation marks omitted).[53]

[53] *Data Privacy Day, supra* note 28.

166. There are a number of tools that allow websites to obtain affirmative consent from their visitors.

167. One such tool is a cookie banner. Defendant explains: "For consumers, a cookie banner is supposed to create transparency and control. It tells people what information may be collected and gives them a choice about whether certain kinds of tracking should happen."[54]

168. Defendant suggests that banners can be a useful consent tool: "A properly functioning banner should tell users what kinds of cookies are being used and give them a meaningful opportunity to control non-essential tracking."[55]

169. According to Defendant, such consent tools must actually work: "If a website uses a cookie banner, consent management platform, or privacy preference center, the company may need to make sure it actually works as promised."[56]

170. Defendant is so committed to ensuring companies seek consent before "quietly shar[ing]…data with advertisers,"[57] that it published a dedicated intake Quiz entitled "Cookie Privacy: Unauthorized Website Data Tracking." The Quiz solicits

---

[54] *The Rise of Cookie Banner Class Actions, supra* note 23.

[55] *Id.*

[56] *Id.*

[57] MORGAN & MORGAN, *Contact Us* | *Quiz* | *Cookie Privacy*, FORTHEPEOPLE.COM (last visited Nov. 7, 2026), https://www.forthepeople.com/contact-us/quiz/cookie-privacy/.

prospective clients who are "tired of their private information being tracked online without consent."[58]

171. And yet, Defendant intentionally and systematically disabled, inverted, or obscured each of the Website's consent tools that would have put its prospective clients on notice and allowed them to manifest their consent.

**1. Defendant Subverts Its Own Compliance Software**

172. Defendant employs specialized privacy compliance software called OneTrust, one of the most dominant consent management platforms on the market.

173. OneTrust allows a website operator to display a prominent and conspicuous banner that informs visitors of the use of third-party tracking, the use of cookies, and the types of personal information collected, as well as present them with options to accept or reject consent.

174. Defendant disabled it. No prospective client is ever shown such a banner.

175. OneTrust allows an operator to select an "opt-in" consent model, under which the Wiretaps would remain inert until the visitor affirmatively consents.

176. Defendant inverted it. Defendant configured OneTrust's consent model as "opt-out." All tracking is active the moment the Website is accessed.

---

[58] This Quiz functions exactly like all of Defendant's Quizzes. That is to say, it quietly shares prospective clients' private information with advertisers without consent.

177. OneTrust allows an operator to define geolocation rules that apply different consent models by region, country, or state—including rules tailored to the requirements of California law.

178. Defendant declined to define any. Defendant's configuration contains a single global rule applied identically to visitors from all 50 states.

179. OneTrust allows an operator to give visitors a pop-up privacy dashboard: a panel in which the visitor may review the operator's tracking categories and accept or reject them. Defendant hid it in the footer.

180. Defendant installed industry-standard software, only to suppress its functionality. Taken together, Defendant's implementation of consent management software is nothing more than a fig leaf.

**2. No Consent Before Collection**

181. Upon accessing the Website, a prospective client is given no notice that their communications are being shared with third-party advertisers. There are no banners, pop-ups, or privacy warnings.

182. Yet, the Wiretaps fire the moment the prospective client begins interacting with the page.

183. Prospective clients can interact with the Call Now Button and Message Us Buttons[59] without any notice or even a reference to Defendant's privacy policy ("Privacy Policy") and terms of use ("Terms").

184. Yet, the Wiretaps fire on each button click.

185. A prospective client can complete one of Defendant's intake Quizzes without any contextual notice or reference to the Privacy Policy, as the following images show.







186. Yet, the Wiretaps fire on each of the input fields of the Quizzes.

187. It is only upon encountering the (non-Quiz) Form that a prospective client is greeted with "*By submitting this form*, you agree to our Terms & acknowledge our privacy policy." (emphasis added), which "links" to Defendant's Terms and Privacy Policy.

[59] On the contrary, the resulting live chat pop-up suggests messages are "secure and confidential."

188. The "links" to the Terms and Privacy Policy are displayed in light gray. They give no decoration to indicate they are links; they are not underlined and appear as normal text. Their location is annotated by a red arrow in the following image.




189. The phrasing leads the prospective client to believe that the Terms and Privacy Policy are effective only *upon submitting* the Form.

190. However, as discussed *supra,* the Wiretaps fire multiple times as the prospective client interacts with the input fields, before they submit the Form.

191. In fact, it is impossible for a prospective client to view the Privacy Policy before the Wiretaps fire. If a prospective client were to click the "link" to the Privacy Policy

to learn of Defendant's collection practice, this click itself would be recorded by the Wiretaps, before the prospective client's browser can even load the Privacy Policy, as the representative image below shows.


```
"url": "https://analytics.tiktok.com/api/v2/pixel/act", "method": "POST"
"postData": { "text": {
        "pixel": { "code":          "CLTICERC77U441RFHQ60"},
        "page": {
                "url":              "https://www.forthepeople.com/practice-areas/wildfire-lawyers/"
        },
        "page_trigger":             "Click",
        "intent_data": [{
                "destination":      "https://www.forthepeople.com/privacy-policy/",
                "inner_text":       "Privacy Policy"
        }]
}}
```


### 3. Defendant Hides Its Privacy Policy

192. Other than the "link" provided in the Form, the only other place a prospective client can access the Privacy Policy is via a link buried in the footer of each page, as the below image illustrates.




193. These footer links are the second-to-last element on any given page, which may have thousands of elements before it. Defendant, again, colors the links to the Privacy Policy and Terms in light gray. It, again, gives no decoration to indicate they are links; they are not underlined and appear as normal text. Defendant makes the links to the Privacy Policy and Terms among the smallest text on any given page. Defendant's codebase considers it a caption.

194. The links to the Privacy Policy and Terms are particularly small compared to other elements on the Website. The Call Now Button's phone number is 169% larger. The

Form's submit button's text is 38% larger. Variations of the word "confidential," which Defendant writes over 1,000 times on the Website, usually in some variation of the phrase "Contact Morgan & Morgan for a free **and confidential** case evaluation," are 23% larger on average.

### 4. Illusory Privacy Choices

195. Defendant configured all Wiretaps to operate under an "opt-out" model, meaning they are deemed consented to until a prospective client opts otherwise.

196. A prospective client who wishes to refuse tracking must do so by accessing a small, uncolored "Your privacy choices." button located in the footer.



197. Similar to the Privacy Policy "link," this button is significantly smaller than the Form's colorful button(s), and appears at the bottom of any given page, as the fourth-to-last element.

198. If a prospective client clicks this button, the Wiretaps are triggered, as the following representative image shows.


```
"method":   "GET",
"url":      "https://analytics.twitter.com/i/adsct?txn_id=nxfy9[...]",
"queryString": {
      "tw_document_href":   "https://www.forthepeople.com/practice-areas/wildfire-lawyers/",
      "events":             [[
            "autobuttonclick",
            {"value":         "Your privacy choices."}
      ]]
}
```


199. If a prospective client clicks "Reject All," the Wiretaps are again triggered.


```
"method":   "GET",
"url":      "https://www.facebook.com/tr/?id=949599355081131&ev=SubscribedButtonClick[...]",
"queryString": {
      "cd[buttonFeatures]":   {
            "innerText":      "Reject All"
      }
      "dl":                   "https://www.forthepeople.com/practice-areas/child-sexual-abuse/",
      "pmd[description]":     "If you or your loved one is a survivor of child sexual abuse, our
child sexual abuse lawyers are here for you with a confidential, free case evaluation.",
}
```


200. The Wiretaps continue firing even after the prospective client rejects tracking. For their rejection to take effect, the prospective client must fully refresh the page, a secret step Defendant fails to disclose, including in its Terms and Privacy Policy.

201. Defendant's Privacy Policy states: "Where required by applicable law, the Site also recognizes the Global Privacy Control (GPC) signal." GPC is a browser setting

that automatically tells every website a user visits that the user opts out of the sale or sharing of their personal information. California identifies GPC as an "opt-out preference signal," which a business "shall treat ... as a valid request to opt-out of sale/sharing." Cal. Code Regs. tit. 11, § 7025(c)(1).

202. Contrary to Defendant's representations and despite OneTrust receiving and recording GPC signals, the Website does not honor GPC signals sent by prospective clients. A prospective client who visits the Website with GPC enabled has their communications intercepted by the Eavesdroppers, including TikTok, exactly as if the signal had never been sent.

203. In Defendant's words, "When a consumer takes the time to say no to non-essential tracking, that choice should mean something." "If a consumer clicks 'reject all' or disables advertising cookies, the website should not continue to collect the very data the consumer declined to share."[60]

**5. Collection on Minors**

204. Defendant collects and shares sensitive personal information on minors, despite claiming that it does not.[61]

---

[60] *The Rise of Cookie Banner Class Actions, supra* note 23.

[61] "We do not knowingly 'sell', 'share', or use for 'targeted advertising' the personal information of consumers we know to be less than 18 years of age." MORGAN & MORGAN, *Privacy Policy*, FORTHEPEOPLE.COM (last visited Nov. 7, 2026), https://www.forthepeople.com/privacy-policy/.

205. Several of Defendant's Quizzes, including "Social Media Harm" and "Grok AI Lawsuit," are designed to collect information on minors. Indeed, the litigation contemplated by the Quizzes is primarily focused on harm done to minors.

206. In some, Defendant explicitly asks if the prospective client is under 18. In others, Defendant asks for a date of birth, which Defendant then uses to calculate the user's age.







207. If a prospective client is under 18, Defendant's internal codebase tags them as a minor, but still allows them to complete the Quiz.

```
if (dobValue) {
        …
        let age  = today.getFullYear() - dob.getFullYear();
        …
        isMinor = age < 18;
}
```

208. Once the minor submits the Quiz, Defendant's internal code marks them as a lead and sends the minor's collected information to its internal database as normal.

```
// --- MINOR / LOVED ONE / REPRESENTATIVE SIGNER ---
else if (
    ...
    over_18.equals('No') ||
    isMinor
) {
    feathery.fields['Case Status'].value          = 'Lead'
    feathery.fields['Status Detail'].value        = 'Needs to be Qualified';
}
```

209. The Wiretaps fire as usual on Quizzes that collect sensitive personal information on minors, allowing the Eavesdroppers to intercept this information as if it were any other Quiz. At no point does Defendant obtain consent, either from the minor or their parent or guardian, to allow this type of sharing.

**<u>TOLLING, CONCEALMENT & ESTOPPEL</u>**

210. Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of the facts alleged herein, including Defendant's incorporation of the Wiretaps into the Website.

211. The Wiretaps were and are entirely invisible to Website visitors.

212. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

213. Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

214. Defendant had exclusive knowledge that the Website incorporated the Wiretaps and yet failed to disclose to prospective clients, including Plaintiff and Class

Members, that by communicating with Defendant through the Website, Plaintiff's and Class Members' confidential information would be intercepted and recorded by unauthorized third parties.

215. Defendant was under a duty to disclose the nature, significance, and consequences of its facilitation of the tracking scheme described herein. To the present, Defendant has not conceded, acknowledged, or otherwise indicated to its prospective clients that it has enabled third parties to intercept and record their confidential information. Accordingly, Defendant is estopped from relying on any statute of limitations.

216. Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

217. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## CLASS ALLEGATIONS

218. Plaintiff brings this nationwide class action on behalf of himself and on behalf of all other similarly situated persons pursuant to Fed. R. Civ. P. 23.

219. Plaintiff seeks to represent the following classes:

**Nationwide Class:** All individuals in the United States who visited a Legal Content Page or used a Contact Method on the Website during the period in which the Wiretaps were installed.

**California Subclass:** All individuals in California who visited a Legal Content Page or used a Contact Method on the Website during the period in which the Wiretaps were installed.

220. The Nationwide Class and the California Subclass are referred to together as the "Classes," and their members as "Class Members." Excluded from the Classes are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any judge who adjudicates this case, including their staff and immediate family.

221. Plaintiff reserves the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

222. Numerosity: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are thousands, if not millions, of individuals in each of the proposed Classes. The Classes are identifiable within Defendant's records and non-party records, such as those of the Eavesdroppers.

223. Commonality and Predominance: Questions of law and fact common to the Classes predominate over any questions affecting only individual Class Members. These include:

a. Whether Defendant intentionally installed the Wiretaps into the code of its Website;

b. Whether the Wiretaps permit unauthorized third parties to intercept users' personal information and communications;

c. Whether users' communications with Defendant are confidential;

d. Whether Defendant facilitated or aided the interception of Plaintiff's and Class Members' communications and identifying information by the Eavesdroppers;

e. Whether Plaintiff and Class Members consented to the tracking scheme described herein, including Defendant's facilitation of it;

f. Whether Plaintiff and Class Members are entitled to damages under the ECPA, CIPA, or any other relevant statute; and

g. Whether Defendant's conduct violates Plaintiff's and Class Members' privacy rights under the California Constitution and common law.

224. Typicality: Plaintiff's claims are typical of the claims of the Classes because all had their personal information and confidential communications compromised as a result of Defendant's use and incorporation of the Wiretaps.

225. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflict of interest that would be antagonistic or adverse to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex litigation and Plaintiff intends to prosecute this action vigorously.

226. Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not afford to litigate a complex claim against large companies, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

227. Upon information and belief, adequate and direct notice can be given to Class Members using information maintained in Defendant's records and non-party records, such as those of the Eavesdroppers.

228. Injunctive Relief: Plaintiff also satisfies the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Classes, making final declaratory or injunctive relief appropriate with respect to the proposed Classes as a whole.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the Electronic Communications Privacy Act

**18 U.S.C. § 2510 *et seq.***

**(On Behalf of Plaintiff and the Nationwide Class)**

229. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

230. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

231. The ECPA protects both the sending and the receipt of communications.

232. 18 U.S.C. § 2520(a) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

233. A violation of the ECPA in this context occurs where any person (1) intentionally intercepts (or endeavors to intercept), (2) the contents of an electronic communication, (3) using a device, (4) without consent or statutory authorization. 18 U.S.C. § 2511(1)(a). The ECPA further prohibits the intentional disclosure or use (or endeavoring to disclose or use) of the contents of an electronic communication where a person knows or has reason to know such information was obtained in violation of the ECPA. 18 U.S.C. §§ 2511(1)(c)-(d).

234. Plaintiff's and Class Members' interactions with Defendant, specifically the Intercepted Contents, constitute contents of electronic communications because they involve the transfer of "signs, signals, writing, images, sounds, data, or intelligence of any nature." 18 U.S.C. § 2510(12).

235. Defendant makes use of "devices" within the meaning of 18 U.S.C. § 2510(5), including without limitation: the Website, the Wiretaps, prospective client browsers, mobile devices and computers, and third-party web servers, as described herein.

236. By utilizing the tracking technology described herein, Defendant procured third parties to intercept—in real time—the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

237. Defendant's participation in the use of Plaintiff's and Class Members' communications for targeted advertising, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), constitutes intentional use of electronic communications in violation of 18 U.S.C. § 2511(1)(d).

238. Plaintiff and Class Members did not consent to or authorize the interception and disclosure of their electronic communications, as described herein. On the contrary, they had every reason to expect the communications would remain confidential.

239. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

240. Thus, although Defendant is a party to the communications at issue, it still incurs liability under the ECPA because it participated in the tracking scheme for criminal and tortious purposes.

241. Defendant's disclosure of Plaintiff's and Class Members' communications, as described herein, is done for purposes of committing criminal and tortious acts in violation of the laws of the United States and California, including, among other things:

a. Breach of Fiduciary Duty to Prospective Clients;

b. California Consumer Privacy Act, Cal. Civ. Code § 1798.100 *et seq.;*

c. Invasion of Privacy / Intrusion Upon Seclusion; and

d. Breach of Confidence.

242. *Breach of Fiduciary Duty to Prospective Clients*: Lawyers owe certain fiduciary duties to prospective clients, even if no attorney-client relationship ensues. *See, e.g., Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978); *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1147-48 (1999); Restatement (Third) of the Law Governing Lawyers § 15 (Am. L. Inst. 2000).

243. The American Bar Association's Model Rules of Professional Conduct codify the duty to keep prospective client communications confidential: "[e]ven when no client-lawyer relationship ensues," a lawyer "shall not use or reveal" information learned from a prospective client. Model Rules of Pro. Conduct r. 1.18(b) (Am. Bar Ass'n 2024). Both Florida, where Defendant is organized and headquartered, and California, where Plaintiff resides, impose this duty. R. Regulating Fla. Bar 4-1.18(a)–(b); Cal. R. Prof. Conduct 1.18(a)–(b); *see also* Cal. Bus. & Prof. Code § 6068(e)(1).

244. Plaintiff and Class Members are Defendant's prospective clients and their interactions with the Website are consultations. Defendant built the Website to solicit

consultations: Legal Content Pages sort prospective clients by inquiry and Contact Methods initiate conversations about the visitor's legal matter. Defendant tells visitors more than 1,000 times across the Website that consultations are "confidential."

245. Plaintiff consulted Defendant in this way. In August 2026, he visited Defendant's California wildfire pages to seek legal advice and representation for property damage caused by the Eaton Fire. He clicked buttons on those pages and entered his personal information into the Website's Form. He relied on Defendant's representations that his information and legal inquiry would remain confidential.

246. Defendant therefore owes Plaintiff and Class Members, as its prospective clients, fiduciary duties of confidentiality and loyalty, including the duty not to reveal their information to third parties, and the duty not to use it for Defendant's own advantage, without their informed consent.

247. Defendant breached its fiduciary duties by, among other things:

a. installing and configuring the Wiretaps to transmit prospective client communications to the Eavesdroppers;

b. enabling features, such as Automatic Advanced Matching and Automatic Events, that allow the Eavesdroppers to link prospective client identities to their Website activity;

c. revealing to certain Eavesdroppers the identities of prospective clients considering claims against them;

d. using prospective client Website activity to target them with advertising for Defendant's own commercial benefit; and

e. disabling, inverting, and obscuring the consent tools that would have informed prospective clients of these disclosures.

248. Plaintiff and Class Members never gave informed consent. A light-gray, undecorated footer link, a Privacy Policy that cannot be reached before the Wiretaps fire, and an opt-out that does not take effect until the page is reloaded do not constitute informed consent under any standard, much less the standard governing lawyers.

249. *The California Consumer Privacy Act*: Additionally, Defendant's conduct violates the California Consumer Privacy Act, Cal. Civ. Code § 1798.100 *et seq*. ("CCPA"), as amended by the California Privacy Rights Act of 2020. The CCPA specifies what is required of businesses that share personal information with third parties for cross-context behavioral advertising ("CCBA"). Cal. Civ. Code § 1798.140(ah).

250. The CCPA requires notice, *at or before the point of collection* ("Notice at Collection"), disclosing the categories of personal information collected and whether the information is shared for CCBA. Cal. Civ. Code § 1798.100(a)–(b); Cal. Code Regs. tit. 11, § 7012(a).

251. Notice at Collection must be localized, contextual, and readily available; a link to the privacy policy in a website's footer does not satisfy Notice at Collection. The Wiretaps share Plaintiff's and Class Members' personal information as soon as they access the Website and at multiple points on every page of the Website, all without Notice at

Collection. Furthermore, the Quizzes contain no notice at all, and the Form's notice is neither conspicuous nor encountered before the Wiretaps fire.

252. The CCPA requires businesses that share personal information to provide a simple and easy-to-use method to opt out of the sharing. Cal. Civ. Code § 1798.135(a). In effectuating opt-out preferences, the CCPA prohibits the use of dark patterns, or "[u]ser interfaces or choice architectures that have the substantial effect of subverting or impairing a consumer's autonomy, decisionmaking, or choice..." Cal. Civ. Code § 1798.140(l); *see also* Cal. Privacy Prot. Agency, Enforcement Advisory No. 2024-02 (Sept. 4, 2024). As described herein, the Website's privacy opt-out choices are deliberately not effectuated until the visitor reloads the page, meaning the Wiretaps continue to fire until the visitor has done so. Defendant fails to disclose this fact, which is a significant impairment to consumer choice and constitutes a dark pattern under the CCPA. Additionally, Defendant intentionally obscures the link to its Privacy Policy and its "Your privacy choices." button, in violation of the CCPA's conspicuousness requirement. Cal. Code Regs. tit. 11, §§ 7011(d), 7015(b).

253. The CCPA requires a business to honor an "opt-out preference signal sent with the consumer's consent by a platform, technology, or mechanism." Cal. Civ. Code § 1798.135(b)(1); see also § 1798.135(e). The GPC signal is considered an opt-out preference signal. As described herein, the Website receives and records the GPC signal yet allows the Eavesdroppers' interception scheme to continue unabated.

254. The CCPA provides additional protections for the collection and sharing of personal information of minors, which is classified as sensitive personal information. Cal. Code Regs. tit. 11, § 7001(bbb)(4). It requires affirmative opt-in by the parent or guardian for minors under 13, or minors themselves if at least 13 and under 16. Cal. Civ. Code § 1798.120(c). As described herein, the Website contains certain Quizzes designed to collect information on minors. Those Quizzes contain no CCPA-compliant opt-in mechanism.

255. As such, Defendant cannot viably claim any exception under 18 U.S.C. § 2511(2)(d) to ECPA liability.

256. As a result of each and every violation thereof, on behalf of himself and the Nationwide Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510 *et seq*.

**COUNT II**

**Violation of the California Invasion of Privacy Act**

**Cal. Penal Code § 631**

**(On Behalf of Plaintiff and the California Subclass)**

257. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

258. The California Invasion of Privacy Act ("CIPA") prohibits the interception, reading, or recording of another person's communications without the consent of all parties. Cal. Penal Code §§ 631, 632.

259. Cal. Penal Code § 631(a) prohibits persons from (1) intentionally tapping or making an unauthorized connection with a transmission line or instrument, (2) willfully

and without the consent of all parties reading or attempting to read or learn the contents of a communication while in transit, (3) using or disclosing (or attempting to use or disclose) information so obtained, or (4) aiding, agreeing with, employing, or conspiring with any person to do any of the foregoing.

260. The Intercepted Contents constitute contents of a communication for purposes of CIPA. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 605 (9th Cir. 2020) [hereinafter *Facebook Tracking*].

261. As described herein, the Eavesdroppers tracked and intercepted Plaintiff's and Class Members' communications with the Website, in violation of § 631.

262. At all relevant times, Defendant willfully aided, agreed with, and conspired with the Eavesdroppers by installing and configuring the Wiretaps to transmit—in real time—Plaintiff's and California Subclass Members' communications and identifying information to the Eavesdroppers.

263. Defendant knew that the Eavesdroppers would read and learn the contents of Plaintiff's and California Subclass Members' communications and intended they do so.

264. Neither Plaintiff nor the California Subclass Members consented to the eavesdropping by the Eavesdroppers or Defendant, which occurred in California. Indeed, Defendant disabled, inverted, and obscured the consent tools that would have alerted prospective clients to the interceptions.

265. Under Cal. Penal Code § 637.2(a), any person injured by a violation of CIPA may recover the greater of $5,000 per violation or three times the amount of actual damages. Under § 637.2(b), that person may obtain an injunction against further violations.

266. Plaintiff and California Subclass Members seek statutory damages of $5,000 for each violation of § 631, and an injunction against further violations.

**COUNT III**

**Violation of the California Invasion of Privacy Act**

**Cal. Penal Code § 632**

**(On Behalf of Plaintiff and the California Subclass)**

267. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

268. Cal. Penal Code § 632(a) prohibits persons from intentionally recording confidential communications without the consent of all parties to the communication. A communication is confidential if a party has an objectively reasonable expectation that it is not being overheard or recorded. *Flanagan v. Flanagan,* 27 Cal. 4th 766, 776-77 (2002).

269. Plaintiff and California Subclass Members had a reasonable expectation that their communications would not be overheard or recorded for several reasons:

a. they are protected communications between a law firm and its prospective clients;

b. the communications concern sensitive legal topics about, e.g., their injuries, health conditions, sexual abuse, abuse of minors, and other intensely personal matters;

c. Defendant repeatedly promises that consultations are "confidential" and that its chats are "secure and confidential"; and

d. Defendant disabled the consent tools that would have alerted its prospective clients to the sharing.

270. Plaintiff and California Subclass Members intended their communications to be confined to themselves and Defendant.

271. The tracking technology described herein constitutes amplifying or recording devices for purposes of § 632.

272. Defendant conspired with the Eavesdroppers to intentionally eavesdrop upon and record the confidential communications of Plaintiff and California Subclass Members without their consent. They conducted the scheme by means of the tracking technology described herein, including the Wiretaps and the servers that receive and store Wiretap transmissions.

273. Neither Plaintiff nor the California Subclass Members consented to this recording, nor could they reasonably expect that their communications would be overheard or recorded.

274. Plaintiff and California Subclass Members seek statutory damages of $5,000 for each violation of § 632, and an injunction against further violations.

## COUNT IV

### Invasion of Privacy, Cal. Const. art. I, § 1

### Intrusion Upon Seclusion

**(On Behalf of Plaintiff and the California Subclass)**

275. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

276. Article I, Section 1 of the California Constitution guarantees all people an inalienable right to privacy, which protects individuals against the unwarranted, unauthorized collection, use, or disclosure of their personal information by private parties, in addition to state action. Relatedly, California courts have long recognized a common law protection against intrusion upon seclusion. Because the two claims overlap, courts consider them together and ask whether (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive. *See Facebook Tracking*, 956 F.3d at 601.

277. Plaintiff and California Subclass Members reasonably expected that their communications with Defendant and personal information would not be shared with advertising and technology companies. Plaintiff and California Subclass Members are prospective clients consulting with a law firm about sensitive legal matters and their communications are protected.

278. Defendant's conduct constitutes a serious invasion of privacy and a highly offensive intrusion. The tracking scheme violates the confidentiality of lawyers' consultations with their prospective clients. The intercepted information is among the most sensitive a person can share. The scale is vast: more than 10,000 pages, and the interactions of thousands, if not millions, of prospective clients.

279. Defendant acted deliberately and covertly. It installed, configured, and maintained the Wiretaps. It configured the Website's consent architecture to obscure the

tracking scheme, delayed the effect of opt-outs, and continued tracking minors after its own code identified them as such. In some cases, it revealed prospective client identities to the very companies they were considering suing.

280. Accordingly, Plaintiff and California Subclass Members seek all relief available for invasion of privacy claims under California's Constitution and common law.

## COUNT V

### Breach of Confidence

### (On Behalf of Plaintiff and the California Subclass)

281. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

282. Plaintiff and California Subclass Members conveyed confidential information to Defendant through their use of the Website. That information included their identities and contact information, the fact that they were consulting Defendant, the nature of their legal matters, and their responses to certain of Defendant's intake questions.

283. The information was novel and Defendant did not have it until each prospective client conveyed it. The information described sensitive prospective client matters, which were not known until shared with Defendant.

284. Defendant knew the information was being conveyed in confidence. Defendant is a law firm, bound by duties of prospective-client confidentiality, and Defendant itself solicits the information with promises that its consultations are "confidential."

285. The parties understood that the information would be kept in confidence. Defendant invited the communications on that basis, and Plaintiff and California Subclass Members provided them in reliance on it.

286. Defendant discloses the information in violation of that understanding. Defendant installed and configured the Wiretaps that transmit the Intercepted Contents to the Eavesdroppers.

287. Accordingly, Plaintiff and California Subclass Members seek all relief available for breach of confidence under California law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant and award the following relief:

A. An order certifying the Nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Classes, and appointing Plaintiff's attorneys as Class Counsel;

B. Equitable relief enjoining Defendant from further deploying the Wiretaps on the Website or requiring Defendant to obtain the requisite informed consent before disclosing prospective client communications and personal information to the Eavesdroppers;

C. An order in favor of Plaintiff and the Class Members on all counts asserted herein;

D. Statutory damages of $10,000, or $100 per day for each day of violation, whichever is greater, for each violation of 18 U.S.C. § 2511, as provided by 18 U.S.C. § 2520(c)(2);

E. Statutory damages of $5,000 per violation, or three times the amount of actual damages, whichever is greater, as provided by Cal. Penal Code § 637.2(a);

F. Actual, compensatory, nominal, and punitive damages in amounts to be determined at trial;

G. An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

H. Pre-judgment and post-judgment interest on all amounts awarded;

I. Such other and further relief as this Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Dated: November 11, 2026

**KELLEY PLLC**

By: *<u>/s/ Justin T. Kelley</u>*
Justin T. Kelley

Justin T. Kelley (State Bar No. 336695)
3571 Far West Blvd. #126
Austin, TX 78731
Telephone: (713) 489-4316
Email: justin@kelley-firm.com
*Attorney for Plaintiff*